No. 24-12818-F

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

RYAN GOULD,

*Plaintiff-Appellant,*

v.

BETHANY GUERRIERO,

*Defendant-Appellee.*

---

On appeal from the United States District Court
for the Southern District of Florida

No. 9:24-cv-80022-DMM

---

## APPELLANT'S INITIAL BRIEF

---

James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, Georgia 30345
Tel. (305) 523-9023
james@slater.legal

*Attorneys for Plaintiff-Appellant
Ryan Gould*

**No. 24-12818-F**
*Ryan Gould v. Bethany Guerriero*

**Appellant's Certificate of Interested Persons
and Corporate Disclosure Statement**

Under Rule 26.1 and 11th Cir. Rule 26.1-1(a)(3), Appellant Ryan Gould

certifies that these persons have an interest in the outcome of this case:

1. Alexander, Scott D. (Attorney for Defendant Joseph Strzelecki);

2. Gould, Ryan (Plaintiff-Appellant);

3. Guerriero, Bethany (Defendant-Appellee);

4. Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A.

(Attorneys for Defendant Joseph Strzelecki);

5. King, Ralph E. (Attorney for Defendant-Appellee Bethany Guerriero);

6. King Morse, PLLC (Attorneys for Defendant-Appellee Bethany

Guerriero);

7. Law Office of Eric A. Rice, LLC (Attorneys for Plaintiff-Appellant

Ryan Gould);

8. Matthewman, The Honorable William (United States Magistrate

Judge);

9. Middlebrooks, The Honorable Donald M. (United States District

Judge);

C-1

10.  Morse, Gregory J. (Attorney for Defendant-Appellee Bethany Guerriero);

11.  Rice, Eric A. (Attorney for Plaintiff-Appellant Ryan Gould);

12.  Slater, James M. (Attorney for Plaintiff-Appellant Ryan Gould);

13.  Slater Legal PLLC (Attorneys for Plaintiff-Appellant Ryan Gould); and

14.  Strzelecki, Joseph (Defendant).

No publicly traded company or corporation is known to have an interest in the outcome of this appeal.

/s/ James M. Slater
James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, Georgia 30345
Tel. (305) 523-9023
james@slater.legal

## Statement Regarding Oral Argument

Appellant Ryan Gould believes that oral argument is not necessary under the standard set forth in Rule 34(a)(2). In any event, Appellant is willing to participate in oral argument if the Court believes it would be appropriate and beneficial.

# **Table of Contents**

Jurisdictional Statement ...................................................................1

Statement of the Issues...................................................................1

Statement of the Case ....................................................................2

   I.   Course of Proceedings and Disposition in the Court Below ...........................2

   II.  Statement of Facts...................................................................3

   III. Standard of Review.................................................................10

Summary of the Argument.................................................................11

Argument.................................................................13

   I.   Reasonable jurors could find that Guerriero pointed her firearm at Gould without provocation or cause, thereby violating the Fourth Amendment. ...........13

   II.  Guerriero's conduct violated clearly established constitutional principles, so qualified immunity cannot apply. ...............................................20

   III. Reasonable jurors could find that Guerriero's seizure of Gould violated the Fourth Amendment. ...........................................................24

   IV. Guerriero is not entitled to qualified immunity on Gould's unlawful seizure claims because there was no arguable probable cause to arrest or reasonable suspicion to detain him. .......................................................27

   V.   A reasonable jury could conclude that Guerriero's conduct overcomes Florida's sovereign immunity statute as to Gould's state-law claims.................31

Conclusion ..............................................................33

## **Table of Authorities**

**Cases**

*Allen v. Bd. of Pub. Educ.*,
495 F.3d 1306 (11th Cir. 2007) ............................................................11

*Banuchi v. Hunter v. Leeds*,
941 F.3d 1265 (11th Cir. 2019) ............................................................18

*Blue v. Miami-Dade Cnty.*,
2011 WL 2447699 (S.D. Fla. June 15, 2011)......................................32

*Brown v. Illinois*,
422 U.S. 590 (1975)..............................................................................24

*C.E.L. v. State*,
24 So.3d 1181 (Fla. 2009) ....................................................................28

*C.W. v. State*,
76 So. 3d 1093 (Fla. Dist. Ct. App. 2011)............................................28

*Coffin v. Brandau*,
642 F.3d 999 (11th Cir. 2011) ..............................................................27

*Coleman v. Hillsborough County*,
41 F.4th 1319 (11th Cir. 2022) .............................................................32

*Courson v. McMillian*,
939 F.2d 1479 (11th Cir. 1991) ..................................................... 14, 15

*Croom v. Balkwill*,
645 F.3d 1240 (11th Cir. 2011) ............................................... 14, 19, 28

*Davis v. Williams*,
451 F.3d 759 (11th Cir. 2006) ..............................................................29

*Dominguez v. City of Sweetwater*,
    610 F. App'x 948 (11th Cir. 2015) .......................................................19

*Eiras v. Fla.*,
    239 F. Supp. 3d 1331 (M.D. Fla. 2017) ...............................................31

*Escambia Cnty. Sch. Bd. v. Bragg*,
    680 So.2d 571 (Fla. Dist. Ct. App. 1996) ...........................................31

*Fils v. City of Aventura*,
    647 F.3d 1272 (11th Cir. 2011) ...........................................................23

*Flores v. Rivas*,
    2020 WL 563799 (W.D. Tex. Jan. 31, 2020) ......................................14

*Florida v. Bostick*,
    501 U.S. 429 (1991) ...............................................................................24

*Ford v. City of Boynton Beach*,
    323 So. 3d 215 (Fla. Dist. Ct. App. 2021) ..........................................29

*Garczynski v. Bradshaw*,
    573 F.3d 1158 (11th Cir. 2009) ...........................................................13

*Ghandour v. City of Miami*,
    2024 U.S. Dist. LEXIS 4333 (S.D. Fla. Jan. 9, 2024).........................28

*Glasscox v. Argo*,
    903 F.3d 1207 (11th Cir. 2018) ...........................................................10

*Graham v. Connor*,
    490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ........................ 13, 15, 19

*Helm v. Rainbow City, Alabama*,
    989 F.3d 1265 (11th Cir. 2021) ...........................................................14

*Hill v. Mull*,
    2006 U.S. Dist. LEXIS 77330 (M.D. Ga. Oct. 23, 2006) ...................................32

*Holmes v. Crosby*,
    418 F. 3d 1256 (11th Cir. 2005) ...........................................................................13

*Johnson v. Barnes & Noble Booksellers, Inc.*,
    437 F.3d 1112 (11th Cir. 2006) ...........................................................................31

*Jones v. Walsh*,
    711 Fed. Appx. 504 (11th Cir. 2017)....................................................................14

*Leslie v. Ingram*,
    786 F.2d 1533 (11th Cir. 1986) ...........................................................................15

*Lewis v. Atlantic Disc. Co.*,
    99 So. 2d 241 (Fla. Dist. Ct. App. 1957)..............................................................31

*Michigan v. Long*,
    463 U.S. 1032 (1983)............................................................................................25

*Moore v. Eger*,
    2017 WL 6367598 (M.D. Fla. Oct. 20, 2017) .....................................................32

*Nolin v. Isbell*,
    207 F.3d 1253 (11th Cir.2000) ............................................................................19

*Oliver v. Fiorino*,
    586 F.3d 898 (11th Cir. 2009) ..................................................................... 20, 23

*Olson v. Stewart*,
    737 F. App'x 478 (11th Cir. 2018 .......................................................................29

*Petta v. Rivera*,
    143 F.3d 895 (5th Cir. 1998) ...............................................................................14

*Priester v. City of Riviera Beach*,
    208 F.3d 919 (11th Cir. 2000) ...............................................................20

*Prieto v. Malgor*,
    361 F.3d 1313 (11th Cir. 2004) .............................................................32

*Rebalko v. City of Coral Springs*,
    552 F. Supp. 3d 1285 (S.D. Fla. 2020).................................................29

*Rushing v. Parker*,
    599 F.3d 1263 (11th Cir. 2010) .............................................................27

*Saunders v. Duke*,
    766 F.3d 1262 (11th Cir. 2014) ....................................... 19, 20, 21, 22

*Slicker v. Jackson*,
    215 F.3d 1225 (11th Cir. 2000) .............................................................20

*Smith v. Mattox*,
    127 F.3d 1416 (11th Cir. 1997) ....................................... 20, 21, 22, 23

*Stephens v. DeGiovanni*,
    852 F.3d 1298 (11th Cir. 2017) .............................................................23

*Tana v. Dantanna's*,
    611 F.3d 767 (11th Cir. 2010) ...............................................................10

*Terry v. Ohio*,
    392 U.S. 1 (1968)........................................................... 24, 25, 28

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975)..............................................................................26

*United States v. Place*,
    462 U.S. 696 (1983)..............................................................................26

*United States v. Acosta*,
    363 F.3d 1141 (11th Cir. 2004) ........................................25

*United States v. Chaidez-Reyes*,
    996 F. Supp. 2d 1321 (N.D. Ga. 2014)..............................25

*United States v. Gil*,
    204 F.3d 1347 (11th Cir. 2000) ........................................26

*United States v. Hunter*,
    291 F.3d 1302 (11th Cir. 2002) ........................................26

*United States v. Nargi*,
    732 F.2d 1102 (2d Cir. 1984) ..........................................14

*United States v. Salman*,
    286 F. Supp. 3d 1325 (M.D. Fla. 2018)............................26

*Von Stein v. Brescher*,
    904 F.2d 572 (11th Cir. 1990) ........................................27

*Washington Cnty. Kennel Club, Inc. v. Edge*,
    216 So. 2d 512 (Fla. Dist. Ct. App. 1968)........................32

*Wilkerson v. State*,
    556 So.2d 453 (Fla. 1st DCA 1990) ................................29

**Statutes**

28 U.S.C. § 1291 ..............................................................1
28 U.S.C. § 1367 ..............................................................1
28 U.S.C. § 1331 ..............................................................1
42 U.S.C. § 1983 ............................................................13
Fla. Stat. § 768.28(9)(a) ..................................................31
Fla. Stat. § 843.02 ..........................................................28

**Other Authorities**

U.S. Const. amend. IV ....................................................13

## Jurisdictional Statement

This is a direct appeal from a final judgment of the district court, for which this Court has subject matter jurisdiction under 28 U.S.C. § 1291. The district court maintained subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367.

## Statement of the Issues

I.      Whether a reasonable jury, when construing the inferences in favor of Plaintiff-Appellant, could have found that Defendant-Appellee's pointing of her service weapon at Plaintiff-Appellant, whom Defendant-Appellee knew was not the suspect and did not have a weapon, constituted excessive force in violation of Plaintiff-Appellant's Fourth Amendment rights.

II.     Whether it was clearly established at the time that unprovoked pointing of a firearm at a compliant victim or bystander who posed no safety threat violated the Fourth Amendment.

III.    Whether a reasonable jury could have found, when construing the inferences in favor of Plaintiff-Appellant, that Defendant-Appellee's seizure of Plaintiff-Appellant violated the Fourth Amendment when Defendant-Appellee lacked probable cause or arguable probable cause to arrest Plaintiff-Appellant for obstruction under Florida law.

IV.    Whether it was clearly established at the time that the seizure of Plaintiff-Appellant violated the Fourth Amendment in the absence of arguable probable cause to arrest or detain Plaintiff-Appellant for the crime of obstruction under Florida law or any other basis to detain him.

V.    Whether a reasonable jury could find, in construing the inferences in favor of Plaintiff-Appellant, that Defendant-Appellee arrested or falsely imprisoned Plaintiff-Appellant without any lawful basis or legal immunity because of Defendant-Appellee's aggressive and aberrant behavior.

## Statement of the Case

This is a federal civil rights action alleging that Defendant-Appellee Bethany Guerriero ("Guerriero" or "Appellee") violated Plaintiff-Appellant Ryan Gould's ("Gould" or "Appellant") clearly established rights under the Fourth Amendment to the United States Constitution and state law. The case is before the Court on an appeal from a final judgment on Appellee's motion for summary judgment.

## I.    Course of Proceedings and Disposition in the Court Below[1]

Gould filed this lawsuit on January 10, 2024 against Guerriero and Officer Joseph Strzelecki of the City of Palm Beach Gardens Police Department for

---

[1] Pursuant to 11th Cir. R. 28-5, citations are to the document number in the district court using the following format: (Doc., p./pp. _____). In references to all documents, including transcripts, the page number refers to the page number generated by CM/ECF in the upper right corner of the document.

violations of the Fourth Amendment and Florida law. (Doc. 1.) On January 22, 2024, Strzelecki answered the Complaint. (Doc. 8.) And on February 20, 2024, Guerriero moved to dismiss the Complaint on several bases, including qualified immunity and arguments related to state court pleading requirements that do not apply in federal court. (Doc. 15.) The trial court ultimately denied Guerriero's motion to dismiss (Doc. 45), and she failed to answer the Complaint within the time prescribed by the Federal Rules of Civil Procedure.

On June 5, 2024, Strzelecki moved for summary judgment on Gould's claims. (Docs. 29, 31–32) Gould responded (Docs. 38–41, 43), and Strzelecki filed a reply. (Doc. 44.) On July 11, 2024, Guerriero moved for summary judgment on the entirety of the Complaint (Docs. 49 & 50). Gould responded to Guerriero's motion (Docs. 52–54), and Guerriero did not reply.

On August 29, 2024, the trial court granted both motions for summary judgment and entered final judgment for the defendants. (Docs. 56 & 57.) The next day, Gould filed his notice of appeal. (Doc. 58.) This appeal follows.[2]

**II.    Statement of Facts**

On May 9, 2023, Gould was swimming laps in his residential complex's community pool. Gould generally swam in the pool as part of his exercise routine.

---

[2] Since filing the notice of appeal, Gould and Strzelecki reached a settlement and Gould moved to dismiss him from the appeal, which the Court granted. (Doc. 66).

(Doc. 32-4 at p. 151:13-18.) That day, however, a woman also went swimming and started an altercation with Gould. (*Id*. at p. 81:20-24.) The woman took issue with the direction that Gould was swimming laps and argued with Gould about swimming in a different manner. (*Id*.) Eventually, the woman's husband arrived, and he also argued with Gould. (*Id*. at p. 155:3-14.) Gould tried to defuse the situation, but the woman's husband approached Gould in a threatening manner and lifted his shirt to reveal that he had a gun in his waistband. (*Id*. at p. 155:15-19; Doc. 43, Surveillance Parking Lot Footage at 11:26:14.)

Gould feared for his safety, so he left the pool area and called 911 to report that he had been threatened with a firearm. (Doc. 36, 911 Call #1.) Gould explained that a man brandished a gun at him. (*Id*. at 00:05.) Gould explained that the person who brandished the gun was about 5'2", 120 pounds, had a beard and brown hair, had no shoes on, and was with a lady in a swimsuit. (*Id*. at 00:30.) Gould stayed on the line until an officer arrived on the scene. (*Id*. at 3:24.)

At approximately the same time, the man with the gun and his wife also each called 911. (Doc. 36, 911 Call #2.) The man with the gun complained that Gould was harassing the man's wife. (*Id*. at 00:05.) He described Gould as 6 feet tall with a multicolored bathing suit. (*Id*. at 00:26.) The caller said that Gould did not have any weapons on him. (*Id*. at 1:00.) The caller suggested that because Gould was wearing a bathing suit, it was obvious that Gould was unarmed. (*Id*.) The caller

explained that he had a weapon on him in a holster in his midsection. (*Id*. at 1:45.)

The caller admitted that he brandished his weapon at Gould. (*Id*. at 3:10.) The wife

also called 911 and reported that she did not see any weapons on Gould. (Doc. 36,

911 Call #3 at 1:50.)

Dispatch alerted officers that there was a situation at the residential complex.

(Doc. 43, Dispatch Radio Recording.) Dispatch aired that a white male in a

multicolored suit was alleged to have harassed a caller's wife. (*Id*. at 00:24.)

Dispatch relayed that the male in the multicolored suit was walking to the other

side of the clubhouse. (*Id*. at 1:15.) Dispatch added that the original caller, who

was not the man in the multicolored suit, had a concealed weapon on him in a

holster in his groin area. (*Id*. at 1:24.) Dispatch stated that the other party had also

called. (*Id*. at 1:52.) Dispatch told officers that the other caller reported that the

man with the gun had made threats and lifted his shirt to show the weapon. (*Id*.)

The man with the weapon was described as a white male, 5'2", 120 pounds, no

shoes, and a beard. (*Id*. at 2:14.) The dispatch incident notes also reflected the

information aired to officers, including that the person with a gun was the caller

with his wife—not the person in the multicolored suit. (Doc. 39-3, p. 7.)

Officer Valerio was the first to arrive on scene. (Doc. 43, Surveillance

Parking Lot Footage at 11:30:54.) Valerio met Gould at the parking lot on the other

side of the clubhouse from the pool. (*Id*.) Valerio talked to Gould briefly without

incident and then left the parking lot to talk to the other two people near the pool. (*Id*. at 11:31:50.) Gould waited in the parking lot for additional officers to arrive. (*Id*.)

Officers Guerriero and Strzelecki arrived next in separate vehicles. (*Id.* at 11:33:07.) When Defendant Guerriero exited her vehicle, she knew that Gould was unarmed and that the caller with the weapon was elsewhere with his wife. (Doc. 32-5, pp. 113:12-118:11; Doc. 29, Guerriero Bodyworn Camera ("BWC") at 11:37:48.) Guerriero looked at Gould but did not see a bulge or any visual indication that Gould may have been armed. (Doc. 32-5, p. 92:2-6.) Guerriero also did not see any indication or have any information suggesting that a weapon was in a pile under a towel on the ground. (*Id*. at 74:19-24.) Officer Strzelecki had no fear for his safety throughout his encounter with Gould. (Doc. 38-1, p. 133:6-9.) At the time, Gould was wearing only a bathing suit, which would have made it nearly impossible to conceal a weapon on him without a bulge or other visual indication. (*Id*. at 70:21-24.)

Guerriero asked Gould to keep his hands out of his pockets for her. (Doc. 29, Guerriero BWC at 11:33:13.) Guerriero stated that her request was essentially a "friendly ask" for him to keep his hands out his pockets. (Doc. 32-5, p. 57:10-13.) Gould said that he was not the person with the gun. (Doc. 29, Guerriero BWC at 11:33:13.) Gould then grabbed his cell phone out of his bathing suit pocket. (*Id*. at

11:33:15.) Guerriero more assertively commanded Gould to keep his hands out of his pockets. (*Id*. at 11:33:17.) Gould did not put his hands in his pockets following that command. (*Id*.) Gould grabbing his cell phone out of his pocket did not cause Guerriero to draw her firearm. (*Id*.) Instead, Guerriero became verbally aggressive with Gould. (*Id*.) Gould became concerned about Guerriero's tone and demeanor. (*Id*. at 11:23:19.) Gould said that he had not committed a crime and asked Guerriero not to talk to him in a hostile manner. (*Id*.) Gould said that Guerriero was the one with the gun. (*Id*.) In response to Gould's critical comments, Guerriero drew her weapon on Gould and ordered him to the ground (*Id*. at 11:33:24.) For the second time in mere minutes, Gould was now being threatened with a firearm.

Gould complied with commands to get on the ground. (*Id*. at 11:33:25.) He lay down with his bare chest directly on the pavement. (*Id*.) Guerriero then placed Gould in handcuffs and put him under arrest. (*Id*. at 11:33:39.) Guerriero did not pat search Gould for weapons and expressed no concern that Gould was potentially armed following the arrest. (*Id*. at 11:33:49.) Guerriero explained to Gould that he was under arrest because he did not want to listen. (*Id*.) Guerriero continued yelling at Gould even though he was in custody. (*Id*. at 11:33:51.) Guerriero called Gould a "punk." (*Id*. at 11:35:28.) Guerriero mocked the nail polish on Gould's toes. (*Id*. at 11:36:10.)

Guerriero walked away from Gould and explained the situation to another officer. (*Id*. at 11:37:27.) She explained that she knew that the person with the weapon was elsewhere, and that Gould was unarmed. (*Id*. at 11:37:59.) Guerriero admitted that she knew this information before she left her car and encountered Gould. (Doc. 32-5, pp.113:12-118:11.) Guerriero explained to the other officer that Gould had his hand in his pocket when she commanded him to take his hands out of his pockets. (Doc. 29, Guerriero BWC at 11:38:05.) Guerriero falsely claimed that Gould tried to put his hands back into his pockets when she ordered Gould to get on the ground. (*Id*. at 11:38:25.) Guerriero also falsely claimed that Gould did not listen to her "the first couple times" when he put his hands into his pockets and thought it was funny to disobey officers. (*Id*. at 11:38:48.)

Separately, Officers Strzelecki and Valerio were talking with the man with the gun and his wife by the pool. (Doc. 29, Strzelecki BWC at 11:36:40.) Valerio confirmed that the man was armed and asked to see his ID and CCW permit. (*Id*.) The man said that the documents were in his front pocket and waited to see what Officer Valerio wanted him to do. (*Id*. at 11:36:55.) Officer Valerio said it was fine to grab the documents from his pocket and explained that the man had a right to bear arms. (*Id*.) The man lifted his shirt to show the gun visibly in his waistband at Valerio's request. (*Id*. at 11:37:05.) Officer Valerio took the weapon into his custody without incident. (*Id*.)

Gould was transported to be booked for one count of resisting an officer without violence. (Doc. 32-3 at p. 7.) The charge was based on claims by Guerriero that Gould "was told multiple times by [Officer] Guerriero to keep his hands out of his pockets but Mr. Gould defied commands and reached into his right front pocket and pulled out a cellphone." (*Id*.)

A supervisor on scene, Sergeant Glass, was concerned about Guerriero's demeanor. (Doc. 49-1, p.12.)  Sgt. Glass thought it was particularly odd that Gould was not searched despite Guerriero's claim that she feared he may have been armed. (*Id*.) Sgt. Glass sought to review surveillance footage because Guerriero's demeanor and behavior was not sitting right with him. (*Id*. at 13.) Guerriero claimed that she had a medical issue and left the scene. (*Id*.) Sgt. Glass eventually reviewed footage of the encounter and found Gould "overall compliant" except for removing the cell phone from his pocket. (*Id*.) Officers also confirmed that Gould was the victim in the encounter and ordered that Gould be removed from the jail and brought home. (*Id*. at 13-14.) Sgt. Glass did not believe that probable cause existed to charge Gould based on his review of the video. (*Id*. at 14.) Sgt. Beath also reviewed the encounter and found concerns with Guerriero's behavior and claims. (*Id*. at 14-17.) Sgt. Beath thought that Guerriero "exaggerated" her account to "justify her actions." (*Id*. at 17.)

A disciplinary investigation concluded that Guerriero violated multiple department policies. (*Id*. at 33-37.) As a result of that investigation, Guerriero was terminated from the agency on August 25, 2023. (Doc. 32-5, p. 12:5-7.) After contesting her termination, Guerriero was recently reinstated as an officer.

Gould sued alleging violations of his constitutional rights due to Guerriero's unlawful conduct. (Doc 1.) Guerriero's motion to dismiss was denied based on the allegations in the complaint. (Doc. 45.) However, the district court granted Guerriero's motion for summary judgment and dismissed Gould's claims. (Doc. 56.) Gould brings this appeal to challenge that decision.

## III.    Standard of Review

An appellate court reviews a grant of summary judgment *de novo*. *Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010). Summary judgment may be granted only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court considering a summary judgment motion must "draw all reasonable inferences in favor of the party opposing summary judgment." *Glasscox v. Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). Even when the parties agree on a set of facts, a court should deny summary judgment if "reasonable minds might differ on the inferences arising from undisputed facts." *Id*. (quotation omitted). If a factfinder could draw more than one inference from a set of facts, and those multiple inferences create a

genuine issue of material fact, summary judgment must be denied. *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007). Credibility determinations, weighing of evidence, and drawing of legitimate inferences are reserved for the jury, and a judge should not appropriate those functions when ruling on a motion for summary judgment. *Id*.

## Summary of the Argument

The district court concluded that Gould failed to establish violations of federal and state law when Guerriero pointed her firearm at him and then seized him. The district court also concluded that even if there were a constitutional violation, Guerriero would be entitled to qualified and sovereign immunity for the federal and state-law claims, respectively.

First, the district court erred when it held that no dispute of material fact existed and that the record failed to support that a constitutional violation occurred. A reasonable jury, when construing inferences in Gould's favor, could find that Guerriero violated Gould's Fourth Amendment rights when she pointed her firearm at Gould because he argued with her, knowing that he was unarmed and posed no safety threat. At the time, Guerriero knew that Gould was not the victim and not the suspect, Gould did not have a firearm, and she had only made a "friendly ask" for Gould to keep his hands out of his pockets. Even if Guerriero had cause to draw her firearm when Gould reached into her pocket, she did not do

so. Instead, that moment dissipated without the need for threat of force. Later, when Guerriero became angry that Gould was upset about her demeanor, she drew her firearm on him to stop his criticism. This conduct constitutes unnecessary and excessive force and violated Gould's Fourth Amendment rights.

Second, it was clearly established at the time that pointing a firearm—threatening deadly force—at a victim or bystander in this circumstance violated the Fourth Amendment.

Third, a reasonable jury, when construing inferences in favor of Gould, could find that Guerriero seized Gould in violation of the Fourth Amendment because there was no probable cause or arguable probable cause for obstruction under Florida law or other basis to detain him.

Fourth, it was clearly established at the time that in the absence of arguable probable cause, Guerriero could not seize or arrest Gould.

Last, because Guerriero seized Gould without a lawful basis and in a malicious and vindictive manner, a reasonable jury could find that Guerriero's conduct was so egregious as to overcome Florida's sovereign immunity statute, section 768.28(9)(a), Florida Statutes.

## Argument

I. **Reasonable jurors could find that Guerriero pointed her firearm at Gould without provocation or cause, thereby violating the Fourth Amendment.**

For Gould to establish a claim under 42 U.S.C. § 1983, he must establish (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law. *Holmes v. Crosby*, 418 F. 3d 1256, 1258 (11th Cir. 2005).

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment's freedom from unreasonable seizures includes the "right to be free from the use of excessive force in the course of an arrest." *Hardigree v. Lofton*, 992 F.3d 1216, 1231 (11th Cir. 2021). The reasonableness of force depends on "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). This is not a situation where the Court is asked to consider what Guerriero knew "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). In conducting this analysis, "the only perspective that counts is that of a

reasonable officer on the scene at the time the events unfolded." *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1273 (11th Cir. 2021).

An officer's display of their weapon and threat to use force is analyzed under the Fourth Amendment to determine whether it is reasonable conduct. *Jones v. Walsh*, 711 Fed. Appx. 504, 507 (11th Cir. 2017). When an officer draws their weapon, it must be reasonably necessary for protection or maintenance of order. *Id.* (citing *Courson v. McMillian*, 939 F.2d 1479, 1494–95 (11th Cir. 1991)). An officer's display of a weapon and threat of force is unreasonable when not necessary based on the nature of the stop. *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) (*citing*, *inter alia*, *Petta v. Rivera*, 143 F.3d 895, 905 (5th Cir. 1998)); *see also Courson*, 939 F.2d at 1494–95 (citing *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984) ("no hard and fast rule concerning the display of weapons in investigative stops") (internal quotation omitted)). There is a robust consensus across circuits that an officer who brandishes a weapon at a bystander or compliant victim is objectively unreasonable under the *Graham* factors. *Flores v. Rivas*, 2020 WL 563799, at *8-9 (W.D. Tex. Jan. 31, 2020) (denying qualified immunity based on collection of precedent clearly establishing that it is excessive force to brandish a gun at a compliant person).

In *Courson*, a panel of this Court held that an officer's drawing of a firearm was not excessive use of force where he was alone late at night at a vacant

construction site and had stopped a vehicle containing several uncooperative occupants. *Courson*, 939 F.2d at 1496. Those occupants did not immediately exit their vehicle after being commanded and appeared intoxicated. *Id.* Notably, the Court did not hold that drawing a weapon is *per se* permitted in all encounters. *Id*. at 1494-95 (permitting drawn weapons "when reasonably necessary for protecting an officer or maintaining order") (citation omitted). In that matter, the Court recognized that facts existed that justified the officer's use of threatened deadly force. As the officer approached the occupants, the officer could not have known if the occupants were armed. *Id.* at 1496. The panel in *Courson* noted that in "the middle of the night, it is not unusual for law enforcement to have [their] weapon drawn, when approaching individuals suspected of a crime. *Id.*

Unlike *Courson*, facts and inferences drawn in Gould's favor support that no need for threatening deadly force existed. The *Graham*/*Leslie*[3] factors would permit a reasonable jury to find that Guerriero committed excessive force when she drew her firearm—threatening deadly force—and pointed it at Gould based on the information she knew and observed. Each factor is addressed in turn.

(1)    <u>The underlying crime was not severe</u>. Here, the assailant was charged with improper exhibition of a firearm. (Doc. 32-3 at p. 5). Both Gould and

---

[3] *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986).

the other individuals at the pool called 911 explaining what had happened: Gould explained to dispatch that the man—who was 5'2", 120 lbs., with a beard and no shoes—lifted his shirt and displayed a gun in his groin; the other man described Gould as 6' in a multi-colored bathing suit and stated that Gould was not armed. By the time the man with the gun called 911 claiming that Gould had harassed his wife at the swimming pool, he told dispatch that Gould was walking away to the other side of the clubhouse. Gould was merely accused of harassing a caller's wife and was not involved in criminal activity requiring force by responding officers. Even regarding the person who bared his firearm, other officers allowed that man to reach into his pocket to retrieve his license and CCW permit, which were in a pocket near the gun and holster in the man's groin area. Thus, no part of the situation required force by officers merely based on the alleged crime at issue.

(2) <u>There was no immediate threat to the safety of the officers once they encountered Gould</u>. By the time Guerriero arrived on scene, Officer Valerio had already greeted Gould and went to speak to the man with the gun. When Guerriero arrived, a jury could find that she knew that the man with the gun was 5'2, 120 lbs., with a beard and the man without the gun was 6' and in a multicolored bathing suit. (Doc. 32-5, pp. 113:12–118:11; Doc. 29, Guerriero BWC at 11:37:48.) Guerriero could not see any bulge or visual indication that Gould was armed. (Doc. 32-5 at p. 92:2-6.) Nor did she have any indication that

16

there was a gun or weapon under his towel on the ground. (*Id.* at p. 74:19-24.) In fact, she admitted to fellow officers right after the arrest that she knew there was no gun there. (Doc. 29, Guerriero BWC at 11:37:59.) Importantly, Guerriero's fellow officer Joseph Strzelecki, who arrived at the same time, confirmed that there was no safety threat during the encounter with Gould. (Doc. 38-1 at p. 133:6-9.) Even if a potential threat existed when Gould reached into his pocket, he withdrew a cell phone and did not make any further attempts to go into his pockets. Guerriero did not draw her weapon in response to Gould reaching into his pocket—she drew it in response to Gould criticizing her demeanor, which was not a safety threat to officers.

(3)    Gould was not resisting or fleeing, and any minor noncompliance subsided *before* Guerriero drew her firearm. At the initial encounter, Gould pulled his cellphone out of his bathing suit pocket. A moment before, Guerriero *asked* Gould to keep his hands out of his pocket—she admitted that it was a "friendly ask" and not a command. (Doc. 32-5, p. 57:10-13.) After Gould took his cellphone out of his pocket, Guerriero became more aggressive, and Gould did not put his hands back into his pockets. In response to Guerriero's increasing aggression, Gould criticized her comments and in response Guerriero drew her firearm and pointed it at an unarmed Gould. At that time, Gould had been

compliant and had not given any cause at that moment for even threatened force by Guerriero.

> (4)    <u>There was no need for use of force, particularly deadly force</u>.

Pointing a gun at another constitutes a deadly force threat. *Banuchi v. Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019).  Here, there was no need for any use of force, because Guerriero had sufficient information to understand that Gould posed no threat. His appearance matched the description on dispatch of the victim. The way he looked—wearing only a bathing suit without any bulge suggesting he had a weapon—supported that no reasonable officer would believe that force was necessary. Gould confirmed that he was not the victim. And finally, after Guerriero commanded Gould (following the "friendly ask") to keep his hands out of his pockets, he did so. Guerriero did not draw her weapon in response to Gould placing his hand in his pocket. Instead, she used force to stop Gould's criticism of her aggression. Force was not necessary or appropriate to respond to Gould's critical comments.[4] The threat of deadly force in response to criticism was particularly excessive and egregious.

---

[4] Guerriero lied to her fellow officers about whether Gould complied. She told an officer on scene that Gould had tried to put his hands back in his pockets when she ordered him to get on the ground, but the video evidence disputes that. (Doc. 29, Guerriero BWC at 11:38:25.) Guerriero also falsely claimed that Gould did not listen to her "the first couple times" when he put his hands into his pockets and thought it was funny to disobey officers. (*Id*. at 11:38:48.)

(5)    <u>Any use of force was unjustified under the circumstances</u>. Legal authority holds that use of any force is unreasonable when a victim or suspect is compliant. *Croom*, 645 F.3d at 1252 n.17; *Dominguez v. City of Sweetwater*, 610 F. App'x 948 (11th Cir. 2015) (unpublished) ("Although the use of de minimis force during a valid seizure cannot give rise to an excessive force claim, *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir.2000), Officer Abreu cannot cite to any authority suggesting that the level of force he used was *de minimis* in the context of a compliant suspect who is securely in custody."). Whether Guerriero pointing her firearm at Gould based on the totality of the circumstances on the scene (what she knew, what she observed, what her fellow officer observed, etc.) is a triable issue as to whether the force was excessive. *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir.2014).

(6)    <u>Gould was psychologically injured by the force</u>. This Court will look at both the psychological and physical harms in evaluating this factor. *See, e.g.*, *Saunders*, 766 F.3d at 1265–66; *Glasscox*, 903 F.3d at 1216 ("Given that Mr. Glasscox suffered both physical and psychological injuries [from being tased], we cannot agree that this *Graham* factor favors Officer Moses."). Here, Gould suffers from mental anguish, insomnia, and lives in a state of fear because of Guerriero's aggressive and violent behavior. (Doc 39-4, pp. 8–9.) Even if Gould did not suffer compensable injuries, he could still recover nominal damages for the excessive use

19

of force. *Saunders*, 766 F.3d at 1270 (citing *Slicker v. Jackson*, 215 F.3d 1225, 1231–32 (11th Cir. 2000)). The threat of deadly force is a traumatic incident and sufficient to support that the use of force causing the trauma was unreasonable.

Because there are triable issues of fact that remain to be resolved by a jury, the Court should reverse the trial court's decision on summary judgment.

## II.    Guerriero's conduct violated clearly established constitutional principles, so qualified immunity cannot apply.

Guerriero's gratuitous use of force violated clearly established law at the time of the incident. This Court has routinely held that officers cannot gratuitously use force—even *de minimis* force—on individuals who are compliant and not a threat. *Smith v. Mattox*, 127 F.3d 1416, 1418–20 (11th Cir. 1997) (no qualified immunity for officer breaking arm of suspect who "docilely submitted" to request to get down); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000) (no qualified immunity for K-9 attack when suspect was already subdued and lying on ground); *Hadley v. Guiterrez*, 526 F.3d 1324 1333–34 (11th Cir. 2008) ("Applying the excessive force standard would inevitably lead every reasonable officer ... to conclude that the force used here—punching a non-resisting criminal suspect for no apparent reason other than malice—is not protected by our constitution.") (quotations and citations omitted); *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009) ("obvious clarity" that use of Taser on

compliant, non-resisting suspect "was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful."); *Saunders*, 766 F.3d at 1268–69 (gratuitous use of force is excessive).

*Smith* is instructive here. In *Smith*, officers received a tip that some men at a picnic in a front yard possessed cocaine. 127 F.3d at 1417. Officers stopped at the house, which belonged to Smith's mother, to investigate. *Id.* When an officer entered the front yard where Smith was sitting, Smith raised a baseball bat "in a threatening posture." *Id.* at 1417–18. After refusing an order from the officer, who had his gun drawn, to drop the bat, Smith dropped the bat and ran through the backyard and into a street behind his mother's house. *Id.* at 1418. Thinking the police had gone, Smith turned around to go back to the house and found himself face to face with the officer. *Id.* "After first pretending to run again, Smith docilely submitted to arrest upon [the officer's] request for him to 'get down.'" *Id.* Once on the ground, the officer put his knee on Smith's back and pulled his left arm behind his back to place Smith in handcuffs. *Id.*

A panel of this Court affirmed denial of that officer's motion for summary judgment based on qualified immunity concluding that it was obvious to any reasonable officer that such force was excessive. *Id.* at 1419-20. It concluded that even though Smith had resisted, he was not resisting at the time of the force. *Id.*;

21

*Saunders*, 766 F.3d at 1265 ("We have repeatedly ruled that a police officer

violates the Fourth Amendment, and is denied qualified immunity, if he or she uses

gratuitous and excessive force against a suspect who is under control, not resisting,

and obeying commands."). Thus, even when a threat justifying use of force exists,

an officer may not use force once the threat has dissipated. *Smith*, 127 F.3d at

1419–20.

   *Hadley*, although not factual analogous, is also instructive. A panel of this

Court held that a police officer who punched an arrestee in the stomach used

excessive force because the arrestee was handcuffed and not struggling or

resisting. 526 F.3d at 1330. There, the court explained that the officer was "not

entitled to use any force" because the arrestee "neither resisted arrest nor posed a

danger to [the officer]." *Id.*  Similarly, in *Croom*, this Court also held, before the

circumstances here, that brandishing a weapon is unreasonable force when no

circumstances justify it.

   The guidance in *Smith*, *Hadley*, and *Croom* clearly established that the

conduct here violated Gould's constitutional rights. Guerriero made a "friendly

ask" to Gould to keep his hands out of his pockets. Gould pulled his cellphone out

of his swim trunks, and Guerriero changed her tone and issued a command for

Gould to keep his hands out of his pockets. Gould disputes whether there was an

initial command, and whether Gould was noncompliant with it if there was. A

reasonable jury could infer that Guerriero made a mere request—not command—initially and that Gould complied once Guerriero elevated to a command after Gould retrieved his cell phone. At summary judgment, Gould is entitled to this inference. When Guerriero moved from a "friendly ask" to a command, Gould was compliant. Even if Guerriero had been justified under clearly established law to respond to Gould retrieving his cell phone by drawing her firearm, Guerriero did not do so. She drew her firearm later, after Gould was compliant. Guerriero drew her firearm on Gould because he criticized her aggression. Guerriero was on notice that she could not point her firearm at Gould when no safety threat existed, yet she ignored clearly established precedent simply because she was angry.

Even without *Smith*, *Hadley*, or *Croom*, to provide guidance, direct caselaw on point is unnecessary because it was obvious that an officer cannot draw a weapon and threaten deadly force merely because the officer is upset by criticism from a victim they encounter. *Oliver*, 586 F.3d at 908 (holding that the facts of the plaintiff's case fell within the obvious clarity rule); *Smith*, 127 F.3d at 1420 (same); *Glasscox*, 903 F.3d at 1220 (same); *Fils v. City of Aventura*, 647 F.3d 1272, 1290 (11th Cir. 2011) (no qualified immunity under prior precedent and obvious clarity analyses for use of Taser on suspect who did not resist or disobey orders); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1308 (11th Cir. 2017) (officer not entitled to qualified immunity from excessive force claim where he "unexpectedly slapped" a

Bluetooth device from a plaintiff's ear and punched him in the chest "for no reason").

### III.    Reasonable jurors could find that Guerriero's seizure of Gould violated the Fourth Amendment.

A seizure takes place "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The Supreme Court has identified three categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry*, 392 U.S. at 1; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590 (1975). "An arrest is quintessentially a seizure of a person, and therefore subject to the Fourth Amendment's reasonableness requirement." *McClish v. Nugent*, 483 F.3d 1231, 1238 (11th Cir. 2007).

Below, the trial court questioned whether an arrest existed at all in this case.[5] (Doc. 56, p. 11.) This Court considers "four non-exclusive factors" when

---

[5] Gould asserts both false arrest and unlawful seizure claims under the Fourth Amendment. (Doc. 1.) The trial court only considered the false arrest claim in its decision on summary judgment and did not consider whether, absent an

determining whether a given seizure was and remained a *Terry* stop rather than an arrest. *See, e.g.*, *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004). Those factors are: (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." *Id.* (quotation omitted). To determine whether an encounter is an investigative detention or an arrest, a court should also consider whether the suspect is "subjected to restraints comparable to those associated with a formal arrest." *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1335 (N.D. Ga. 2014) (citing *United States v. Acosta*, 363 F.3d 1141, 1149 (11th Cir.2004)) (cleaned up). Officers can hold someone at gunpoint, order them to the ground, and handcuff them without converting a detention into an arrest in certain circumstances. *Id*. at 1335–36. Additionally, the Supreme Court has stated that officers may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Michigan v. Long*, 463 U.S. 1032, 1051, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Based on the facts and inferences that the Court must rely upon, there was no reason to believe that Gould was potentially dangerous.

---

arrest, Guerriero violated the Fourth Amendment by unreasonably detaining or seizing Gould. On that basis alone, the trial court committed error.

Here, the only purpose of placing Gould in handcuffs was to detain him so that he could be transported to jail. Officers did not attempt any investigation—not even a pat down—once Gould was in handcuffs. *See United States v. Salman*, 286 F. Supp. 3d 1325, 1337 (M.D. Fla. 2018) (citing *United States v. Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002)) (explaining how a detention might not convert an encounter into an arrest where a limited stop is conducted to search outer clothing for weapons). Gould was forced to remain on the ground in handcuffs in only his bathing suit. The manner of detention was extremely intrusive and otherwise unnecessary because multiple officers were present, Gould was unarmed, and Gould gave no indication that he would flee or attack officers. Gould remained detained for a lengthy period *following* the initial encounter and resolution of the incident at the pool. *Cf. United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) ("to maintain the safety of the officers and the ongoing investigation of the residence, handcuffing [the defendant] and detaining her in the back of the police car was reasonable"). After Gould was taken away, Officer Strzelecki was tasked with drafting a probable cause affidavit for Gould's arrest. (Doc. 32-3 at p. 7.) This was not a momentary stop for "a brief question or two." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975); *U.S. v. Place*, 462 U.S. 696, 709 (1983). Even if there was no arrest and the initial seizure were reasonable, it would have become unreasonable after Gould was held in handcuffs and transported to jail, in the

absence of any investigation, pat down, or search for a weapon. Officers lacked any basis to believe that Gould posed a safety threat, and they acted in conformity when they made no effort to investigate or resolve any potential threat posed by Gould. Gould was detained for only one purpose: to arrest him based on Guerriero's false claims. The lower court erred when it said that Gould had not stated a constitutional violation for false arrest. Even without a formal arrest, however, Gould's unlawful seizure claims should have gone to a jury because it was an unlawful detention.

**IV. Guerriero is not entitled to qualified immunity on Gould's unlawful seizure claims because there was no arguable probable cause to arrest or reasonable suspicion to detain him.**

In the Fourth Amendment context, this Court has adopted an "arguable probable cause" standard to determine whether qualified immunity applies to unlawful seizure. *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990). Arguable probable cause "exists where reasonable officers in the same circumstances and with the same knowledge as the defendant could have believed that probable cause existed." *Coffin v. Brandau*, 642 F.3d 999, 1007 (11th Cir. 2011). To resolve this inquiry, Guerriero's subjective intent or beliefs are irrelevant. *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010).

Here, Guerriero had no objective basis to detain or arrest Gould. Guerriero asserted that Gould's alleged noncompliance was sufficient to establish probable

27

cause for the crime of obstruction or that she had reasonable suspicion to detain him.[6] (Doc. 49, pp. 5– 6.) But whether Gould was noncompliant is a disputed factual question to be resolved by a jury. When inferences are construed in Gould's favor, a reasonable officer would not have believed that the seizure was appropriate. *See Croom*, 645 F.3d at 1249 (quoting *Terry*, 392 U.S. at 21–22). In fact, other reasonable officers in this matter, Sgts. Glass and Beath, agreed that the seizure of Gould was inappropriate and without legal basis.

The first element of Florida's obstruction statute requires that an officer be engaged in lawful execution of a legal duty.  When an officer has no legal duty to insist on compliance and enforce the insistence, disobedient conduct is not criminal obstruction. *C.W. v. State*, 76 So. 3d 1093, 1095–96 (Fla. Dist. Ct. App. 2011). An officer who is only responding to a call is not engaged in a legal duty that supports criminal obstruction for disobedience. *Ghandour v. City of Miami*, 2024 U.S. Dist. LEXIS 4333, at *12–13 (S.D. Fla. Jan. 9, 2024). This element is not met here because when Gould retrieved his cell phone Guerriero was merely responding to a call and not yet engaged in a legal duty that would trigger obstruction due to disobedience. She knew that Gould was unarmed and that the person with the gun

---

[6] The relevant obstruction statute—section 843.02, Florida Statutes—would require that: "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty." *C.E.L. v. State*, 24 So.3d 1181, 1185–86 (Fla. 2009).

was elsewhere. She did not inform Gould that he was detained or otherwise attempt to detain Gould before he grabbed his cellphone. Thus, Guerriero lacked a legal basis at that point to command Gould to refrain from putting his hand in his pocket or take action if Gould disobeyed. *Ford v. City of Boynton Beach*, 323 So. 3d 215, 228 (Fla. Dist. Ct. App. 2021) (consensual requests from officers can be ignored).

The second element requires that a person's actions constitute obstruction. Generally, a person's words alone do not constitute obstruction. *Davis v. Williams*, 451 F.3d 759, 765 (11th Cir. 2006) ("Florida courts have generally held, with very limited exceptions, that physical conduct must accompany offensive words to support a conviction under § 843.02.") (simple inquiry to officer could not rise to arguable probable cause for obstruction). Instead, the use of "'oppose' in conjunction with 'obstruct' manifests a clear and unambiguous legislative intent to proscribe only acts or conduct that operate to physically oppose an officer in the performance of lawful duties." *Wilkerson v. State*, 556 So.2d 453, 455–56 (Fla. 1st DCA 1990); *see also Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1312 (S.D. Fla. 2020) (conduct that does not obstruct or impede the officer's legal duty does not constitute criminal obstruction); *Olson v. Stewart*, 737 F. App'x 478, 482 (11th Cir. 2018) (unpublished) (profane command did not constitute arguable probable cause for obstruction). Thus, Gould's critical comments, which caused

29

Guerriero to draw her firearm, did not constitute obstruction under the Florida statute.

Gould's physical conduct also did not obstruct officers. Guerriero's fellow officers recognized that no obstruction occurred upon review of the surveillance footage. (Doc. 49-1, pp. 12, 14, 17) (finding that Gould was "overall compliant" except for removing the cell phone from his pocket and finding no probable caused existed based on review of video of the incident). If experienced officers could reasonably find that Gould did not engage in obstruction based on his conduct, there is a triable issue as to whether there is probable cause or arguable probable cause for the charge of obstruction. Because a reasonable jury could find that Gould did not provide even arguable probable cause, this matter should be determined by a factfinder and is inappropriate for resolution on summary judgment.

Finally, there is no objective basis for Guerriero's contention that there was reasonable suspicion to detain Gould. As described above, Guerriero knew that Gould—a 6' man in a multicolored bathing suit—was the victim and that the firearm was elsewhere. Guerriero had no basis to perceive a safety threat; there was no bulge in Gould's swimsuit or other indication that Gould was armed or a threat. The evidence instead supports that Guerriero detained and arrested Gould

because she was angry about his criticism. The Fourth Amendment does not permit detention or arrest as retaliation for angering an officer.

## V. A reasonable jury could conclude that Guerriero's conduct overcomes Florida's sovereign immunity statute as to Gould's state-law claims.

A reasonable jury could find that Guerriero's conduct was so egregious at the time of the incident with Gould as to overcome Florida's sovereign immunity statute, section 768.28(9)(a), Florida Statutes.

Florida courts are split on whether there is a distinction between false arrest and false imprisonment. *See Strickland v. Jacobs*, 66 So.3d 412, 414 n. 1 (Fla. Dist. Ct. App. 2011). False arrest and imprisonment are defined as "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty." *Johnson v. Barnes & Noble Booksellers, Inc*., 437 F.3d 1112, 1116 (11th Cir. 2006) (quoting *Escambia Cnty. Sch. Bd. v. Bragg*, 680 So.2d 571, 572 (Fla. Dist. Ct. App. 1996)). To prevail on a false arrest or false imprisonment claim under Florida law, a plaintiff must prove: "(1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or "color of authority"; and (4) which is unreasonable and unwarranted under the circumstances." *Eiras v. Fla*., 239 F. Supp. 3d 1331, 1340 (M.D. Fla. 2017) (citation omitted). The restraint may be caused by actual force or by threat, the threat may be by conduct or by words. *Lewis v. Atlantic Disc. Co*., 99 So. 2d 241 (Fla. Dist. Ct. App. 1957). There does

not need to be confinement in a jail or prison to state a claim. *Washington Cnty. Kennel Club, Inc. v. Edge*, 216 So. 2d 512 (Fla. Dist. Ct. App. 1968).

Under Florida law, an officer is immune from tort liability unless they act in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights or safety. *Coleman v. Hillsborough County*, 41 F.4th 1319, 1325 (11th Cir. 2022). The first two categories are synonymous and require actual malice. *Id*. The third category requires conduct "much more reprehensible and unacceptable than mere intentional conduct." *Id*. (cleaned up). Unprovoked aggression, arrest without cause, and unnecessary force permit a jury to infer actual malice. *Hill v. Mull*, 2006 U.S. Dist. LEXIS 77330, at *37 (M.D. Ga. Oct. 23, 2006).

"[W]hether an act was committed with malicious purpose, bad faith, or with wanton and willful disregard [to preclude immunity] is not a question that must be submitted to a jury, but rather, can be decided by the Court depending on the facts." *Blue v. Miami-Dade Cnty.*, 2011 WL 2447699, at *2 (S.D. Fla. June 15, 2011) (citing *Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004)). In resolving such facts, "the Court must view all facts in the record in the light most favorable to the Plaintiff." *Moore v. Eger*, 2017 WL 6367598, at *6 (M.D. Fla. Oct. 20, 2017), *aff'd in part*, *appeal dismissed in part* sub nom. *Moore v. Sheriff of Seminole Cnty.*, 748 F. App'x 229 (11th Cir. 2018) (citation omitted).

32

Here, when facts and inferences are taken in the light most favorable to Gould, the elements of false imprisonment and false arrest under Florida law are met. Gould was restrained against his will without legal justification in a manner that was unreasonable under the circumstances. Guerriero knew that Gould was a victim and did not possess a weapon, yet she drew her weapon on him and handcuffed him because she was angry Gould criticized her aggressive demeanor.

A reasonable jury could find that Guerriero's detention and arrest of Gould was based on Gould's criticism of her aggression. Because there is a triable question as to basis of the detention and arrest and the facts favorable to Gould support a retaliatory and unlawful arrest, Gould's state-law claims should be dismissed on summary judgment.

## Conclusion

For all these reasons, Plaintiff-Appellant Ryan Gould respectfully requests that the Court reverse the district court's summary judgment order.

Dated: November 6, 2024

Respectfully submitted,

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, Georgia 30345
Tel. (305) 523-9023
james@slater.legal

*Attorneys for Plaintiff-Appellant*
*Ryan Gould*

### Certificate of Compliance with Type-Volume Limitation, <u>Typeface and Type-Style Requirements</u>

I certify that this brief complies with Rule 32(a)(7)(B) because, excluding the parts of the brief exempted Rule 32(f), this brief contains 8,121 words. Further this brief complies with Rule 32(a)(5) and (6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ James M. Slater*
James M. Slater

### <u>Certificate of Service</u>

I hereby certify that on November 6, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will serve this document on all counsel of record. Further, four paper copies of this brief have been sent via hand delivery to the Clerk of Court in accordance with 11th Cir. Rule 31-3.

*/s/ James M. Slater*
James M. Slater
